**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

------------------------------------------------------- x
                      :

COLLEEN P.[1],                  :        NO. 3:21-CV-1606 (MPS) (RMS)
*Plaintiff,*              :
                      :

V.                        :
                      :

KILOLO KIJAKAZI, ACTING    :
COMMISSIONER OF THE SOCIAL  :
SECURITY ADMIN.,         :
*Defendant.*             :
                      :        DATE: JANUARY 20, 2023
                      :
------------------------------------------------------- x

## RECOMMENDED RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, OR, IN THE ALTERNATIVE, FOR REMAND FOR A HEARING, AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

The plaintiff brings this administrative appeal under § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a final decision by the Commissioner of Social Security (the "Commissioner") denying the plaintiff's application for disability insurance benefits ("DIB"). The plaintiff moves to reverse the Commissioner's decision, or in the alternative, to remand for a re-hearing on the ground that her alleged symptoms of brain fog and fatigue were not properly considered. (Doc. No. 12). The Commissioner has opposed this motion and seeks to affirm the Commissioner's decision. (Doc. No. 14).

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

For the reasons discussed below, the Court respectfully recommends that the plaintiff's motion to reverse (Doc. No. 12) be **DENIED**, and the Commissioner's motion to affirm (Doc. No. 14) be **GRANTED**.

## I.    ADMINISTRATIVE PROCEEDINGS

On September 11, 2018, the plaintiff filed an application for DIB pursuant to Title II of the Act, alleging disability beginning August 22, 2010.   (Doc. No. 6, Certified Transcript of Administrative Proceedings, dated January 13, 2022, ["Tr."] 339).  The plaintiff's application was administratively denied at the initial and reconsideration levels in 2019.  (Tr. 121-139, 140, 141-159).

Administrative Law Judge ("ALJ") Deirdre Horton held two telephonic hearings and rendered to two unfavorable decisions.[2]  The first hearing was held on May 13, 2020. (Tr. 38-77). The plaintiff, represented by counsel, and a vocational expert ("VE") both testified.  (*See id.*).  The ALJ then issued an unfavorable decision on May 29, 2020.  (Tr. 160-179).

On October 29, 2020, the Appeals Council issued an order remanding the case back to the ALJ.  (Tr. 180-186).  In its order, the Appeals Council identified two issues with the ALJ's May 29, 2020, decision warranting remand.  First, "[w]hile the Hearing Decision discussed the claimant's [post-traumatic stress disorder ("PTSD"),] . . . the Administrative Law Judge did not determine whether the claimant's medically determinable PTSD was a severe impairment, and/or analyze it under Listing 12.15. Therefore, further consideration of the nature, severity, and effects of the claimant's PTSD is needed."  (Tr. 182 (internal citation omitted)).  Second,

> The Administrative Law Judge found that the claimant had moderate limitations in interacting with others [], which is supported by the State agency psychiatric review technique (PRT) at both the initial and reconsideration levels[]. However, the Administrative Law Judge found the claimant is limited to simple and routine tasks and she is able to relate appropriately with others for simple, routine tasks. []The

---

[2] Both hearings were conducted telephonically due to the COVID-19 pandemic.  (Tr. 41, 80).

Appeals Council [found] that the claimant's mental residual functional capacity does not adequately account for moderate limitations in interacting with others. Interacting with others refers to the abilities to relate to and work with supervisors, co-workers, and the public. Listing 12.00E2 list the following examples: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. Further consideration of the claimant's limitations in interaction with others, and her mental residual functional capacity, is needed.

(*Id.* (internal citations omitted)).

On remand, the Appeals Council directed the ALJ to: (1) "[f]urther evaluate the claimant's medically determinable PTSD in accordance with the special technique described in 20 CFR 404.1520"; (2) give further and appropriate reconsideration of the plaintiff's residual functioning capacity ("RFC") and specifically "determine the claimant's limitations in interacting with others"; and, (3) "[i]f warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. . . ." (Tr. 183).

ALJ Horton held a second hearing on February 3, 2021.  (Tr. 78-120).  The hearing primarily focused on the plaintiff's anxiety and PTSD, as directed by the Appeals Council.[3]  (*See* Tr. 81).  Another VE also testified.  (Tr. 104-120).  On March 16, 2021, ALJ Horton issued another unfavorable decision.  (Tr. 18-31).  On March 16, 2021, the plaintiff requested review of the second decision by the Appeals Council.  (Tr. 335).  The Appeals Council denied review of the second decision on October 8, 2021, rendering the March 16, 2021, decision as the final decision of the Commissioner.  (Tr. 1).  This appeal followed on December 3, 2021, (Doc. No. 1), and, absent

---

[3] The plaintiff was again represented by counsel at the second hearing.

consent, the case was referred to the undersigned on February 15, 2022, for a recommended ruling. (Doc. No. 9).

On April 20, 2022, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 12) with a Statement of Material Facts (Doc. No. 12-2) and a brief in support. (Doc. No. 12-1). On June 9, 2022, the Commissioner filed her Motion to Affirm (Doc. No. 14), with a responding Statement of Material Facts (Doc. No. 14-2) and a brief in support. (Doc. No. 14-1). The plaintiff filed a reply on July 8, 2022. (Doc. No. 17).

## II.    FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' respective statements of material facts. (Doc. Nos. 12-2; 14-2). The Court cites only the portions of the record that are necessary to explain this decision. The plaintiff's date of last insured ("DLI") was December 31, 2015. (*See* Tr. 122). Therefore, the operative time for determining whether the plaintiff was disabled is between August 22, 2010, and December 31, 2015. *See* 42 U.S.C. § 416(i), 423(c); *Monette v. Astrue*, 269 F. App'x 109, 111 (2d Cir. 2008).

### A.    The Plaintiff's May 13, 2020, Hearing Testimony

The plaintiff testified that, at the time of the hearing, she was 57 years old and had been living alone for one month as her husband had recently moved out and was in the process of getting a divorce. (Tr. 46). She testified that she had completed an associate degree in molecular biology and had two adult children. (Tr. 48, 47).

The plaintiff testified that, though she had a driver's license, she would drive only as needed for medical appointments and groceries. (Tr. 48). She attributed her limited driving to feeling "shaky with brain fog" which started after she stopped working in 2010. (*Id.*). This feeling got progressively worse. (*Id.*).

4

She testified that she had left her job in 2010 and that her husband had supported her financially prior to when he moved out.  (Tr. 50, 51).  She explained that she currently had no income as his "money moved out with him," and she had been unable to find a job.  (Tr. 50, 52).  She also indicated that she had brought a workers' compensation claim and ended up with a small settlement of $16,000 after taxes but received no additional funds from any sort of work after that money was spent.  (Tr. 55).  She denied any prior involvement with law enforcement and problems with drugs or alcohol.  (Tr. 50-51).

Upon examination by her attorney, the plaintiff explained that her delay in seeking benefits was due to the fact she had loved her career and had hoped that someday she would return to work after resting and going to physical therapy.  (Tr. 51).  She recounted that she was promoted eleven times in eleven years.  (Tr. 52).  The plaintiff then testified that issues with her cervical spine were among the first impairments that contributed to her inability to work.  (*Id.*).  The plaintiff stated that she worked on a lab bench "looking down, doing repetitive motions," and that, at some point in 2010, she started having "horrible headaches" and "discovered that it was [an] injury to [her] neck."  (Tr. 53).  She tried, among other things, raising her lab bench but "nothing helped" so she ended up leaving her job.  (*Id.*).  She testified that she was also subsequently diagnosed with fibromyalgia, psoriatic arthritis, two curves in her spine, sleep apnea, "jackhammer esophagus," gastroparesis, irritable bowel syndrome ("IBS"), and gastroesophageal reflux disease ("GERD").  (Tr 53, 55-56).  She attributed her psoriatic arthritis, in part, to her repetitive neck injury.  (Tr. 56).  She also explained that her IBS and GERD occurred prior to 2010 and that her jackhammer esophagus and gastroparesis started after 2010, so it was the progressive accumulation of her conditions that ultimately prevented her from working.  (Tr. 56-57).

Additionally, the plaintiff testified that she saw her therapist, Dr. Laura Radin, weekly since 2013 to help her cope with the loss of her job, health, marriage as well as brain fog.  (Tr. 53-54).

The plaintiff claimed she suffered pain which would reach an eight on a ten-point scale and never fell below a six.  (Tr. 57).  Her "eight days" would outnumber her "six days."  (Tr. 57).  The plaintiff later clarified that some days were indeed better than others allowing her to do marginally more activities but only by a "little bit."  (Tr. 67).  Her pain was very disruptive to her sleep patterns and would cause her to only get non-restorative sleep.  (Tr. 57-59).  As a result, she would find it necessary to nap daily at least an hour every afternoon.  (Tr. 57-59).

As to household activities, the plaintiff testified that she could not do outdoor chores such as shoveling and cutting grass nor any heavier indoor chores such as vacuuming and grocery shopping.  (Tr. 60).  She explained that her husband would do these chores.  (*Id.*).  However, she could assist in doing lighter tasks such as setting the table for dinner.  (Tr. 60).  She also testified that panic and brain fog prevented her from doing household chores.  (Tr. 58).

The plaintiff testified that her impairment prevented her from doing outdoor activities she had previously enjoyed like taking long walks, skiing, waterskiing, and socializing with friends.  (Tr. 61).  She had difficulty walking down her 1,200-foot driveway to retrieve her mail and would sometimes drive to her mailbox.  (Tr. 62).  She attributed the diminishment of her physical abilities to pain and fatigue from lack of sleep.  (Tr. 61).

The plaintiff stated that she could crouch but needed to hold something to get back up and her arthritis and knees would impair her.   (Tr. 62-62).  She could not pour a gallon of milk due to her arthritis, which was made worse by flare ups.  (Tr. 63-64).  For example, one trigger point injection in her neck a few years earlier caused a ten-day flareup which caused her to cancel a trip to see her brother.  (Tr. 64-65, 67).  She also testified to difficulty with stairs due to pain in her

feet from her psoriatic arthritis.  (Tr. 64).  She claimed her arthritis and flareups also prevented her from being able to take trips out of state for at least eight years, though she later clarified that she had taken one trip out of state on a plane.  (Tr. 65, 67).

On reexamination by the ALJ, the plaintiff clarified that early records showing that she did yardwork could be attributed to the fact that she used a ride-on mower and not a push mower. (Tr. 65).  Similarly, she clarified that records purporting to show that she helped her parents around her house were attributable to her having some "better" days and that, at most, she was lifting light boxes of Christmas decorations for them.  (Tr. 66).  Lastly, with her husband present, she would occasionally cook for, and supervise her grandchildren when they came over to swim.  (Tr. 68).

The VE testified that the plaintiff's past relevant work could be classified as: (1) laboratory technician (DOT 022.261-010, light exertion, SVP 7), and (2) research and regulatory affairs coordinator (DOT 168.267-106, sedentary exertion but performed at light, SVP 7).  (Tr. 69).

The ALJ posed a hypothetical to the VE asking him to consider an individual of the claimant's age, work background, and education level with the following limitations:

> Light work, occasional use of ramps and stairs; no use of ladders, ropes, scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; no work around hazardous machinery or unprotected heights; frequent handling and fingering; simple, routine tasks; only able to relate appropriately with other for those simple and routine tasks.

(Tr. 69-70).

The VE affirmed that, with these restrictions, the hypothetical person could not perform any of the plaintiff's past relevant work.  (Tr. 70). However, the VE testified to three other representative examples of jobs in the national economy that could be performed: (1) cashier II (DOT 211.462-010, light exertion, SVP 2, with 573,000 positions open nationally); (2) mail clerk, non-government (DOT 209.687-026, light exertion, SVP 2, with 64,000 open positions

nationally); and (3) office helper (DOT 2390.567-010, light exertion, SVP 2, with 20,000 positions open nationally).   (Tr. 70).  The VE testified that if the hypothetical was further limited to four hours of standing and walking, these three jobs could still be performed but this limitation would greatly erode the open positions available for the cashier II job.  (Tr. 71).  The VE further testified that, if the hypothetical was limited to "occasional handling and fingering," all three jobs would be eliminated.  (*Id.*).

The ALJ then proposed a third hypothetical that was limited to occasional bilateral handling and fingering (but not restricted to only four hours of standing/walking), and the VE responded with the only two jobs available: (1) usher (DOT 344.677-014, light exertion, SVP 2, with 35,000 open positions nationally), and (2) furniture rental clerk (DOT 295.357-017, light exertion, SVP 2, with 58,000 open positions nationally).  (Tr. 71).  The VE affirmed that, if this hypothetical was limited to standing/walking four hours each day, both positions would be eliminated.  (Tr. 72).  Although the VE indicated that other sedentary jobs existed, he indicated that they still would not meet the other limitations imposed.  (*Id.*).

The VE opined that, in her professional opinion, an employer could tolerate up to and including ten percent off-task time in a workday but not more.  (Tr. 72, 75).  Similarly, in her professional opinion, an employer would only tolerate absenteeism of one day each month.  (Tr. 72, 75).  The ALJ also opined that an individual could be informally accommodated with an extra fifteen-minute break during the day so long as the job was not "shift work," and the time could be made up at the end of the day.  (Tr. 73-74).

Lastly, the VE affirmed that her testimony had been consistent with the DOT and that, where the DOT was silent, she based her opinion on her professional experience and knowledge of the positions.  (Tr. 76).

**B.    The Plaintiff's February 3, 2021, Hearing Testimony**

The second hearing, which occurred after the Appeals Council ordered a remand, primarily focused on whether the plaintiff had PTSD as qualified under Listing 12.15. (Tr. 81-82). At the start of her testimony, the plaintiff confirmed there had been no change in her education or employment status and that she had stopped working in 2010. (Tr. 86, 88). The plaintiff explained that her divorce from her husband was soon to be final and that she still lived alone. (*Id.*).

Focusing on her PTSD, the plaintiff explained she was in therapy with her provider, Dr. Radin, who had been treating her weekly for major depressive disorder and generalized anxiety disorder since 2013. (Tr. 88, 99). She stated that, since 2002, she had suffered through a series of unexpected and traumatic deaths, including the death of her young niece. However, it was not until she was referred by her primary care provider to Dr. Radin in 2012 that she understood she suffered from PTSD. (Tr. 89, 91). She testified to having chronic pain which would trigger "flare ups" during which she could not think straight, had nightmares and intrusive memories, and had brain fog and fatigue. (Tr. 90-93). The verbal abuse by her husband exacerbated these symptoms. (Tr. 91).

The plaintiff testified that she considered "brain fog" to encompass difficulty in understanding, remembering, and applying information. (Tr. 95). She testified that she would:

> try to fight against [brain fog] because you feel like, okay, I'm home because when I don't feel good, I tend to stay home. I just don't want to see anybody. I sleep, so I stay home. And you think, okay, well if I'm can't do And you think, okay, well if I[] can't do that . . . it's just difficult to lose concentration and memory and have brain fog. It's frustrating.

(*See* Tr. 94, 95- 96, 97).

She testified that the brain fog made it difficult to pay bills, put together a list, follow recipes, and remember things like her keys. (*Id.*). The plaintiff also testified that, during the

relevant time period, she would have mood swings in which she would become upset and "explosive" with others. (Tr. 94-97). These mood swings were exacerbated by her divorce and would lead to arguments with other people. (*Id.*). She described feelings of worthlessness and being unable to sleep. (Tr. 97-98). She denied that she had ever needed intensive outpatient care or hospitalization for any of these symptoms. (Tr. 103-04). She testified that she could not work on a consistent basis and was out of work a significant amount based on what she was experiencing. (Tr. 98).

The ALJ asked the plaintiff about her medications, and the plaintiff testified that, at the time of the hearing, she was taking Klonopin for anxiety, Adderall to "try to help" with her brain fog, amitriptyline for sleeplessness and pain, and gabapentin for pain. (Tr. 100). However, this current regimen was different than her regimen between 2012 and 2015 (which is the period at issue). During that period, she had taken more pain medication, including oxycodone and hydrocodone. (Tr. 100-101). However, these opioid medications had later been switched or reduced given the opioid epidemic and her body's eventual tolerance to them. (Tr. 101-02). She explained that the anxiety medications, such as Klonopin, helped with her anxiety and sleeplessness but did not do anything to alleviate her brain fog. (Tr. 102-03).

The VE testified that the plaintiff's past relevant work could be classified as: (1) researcher/research scientist (DOT 041.061-010, light exertion, SVP 8), and (2) research and regulatory affairs coordinator (DOT 189.117-014, sedentary exertion, SVP 8). (Tr. 105).

The ALJ posed a hypothetical to the VE asking him to consider an individual of the claimant's age, work background, and education level with the following limitations:

> Light work, occasional use of ramps and stairs; no use of ladders, ropes, scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; no work around hazardous machinery or unprotected heights; frequent handling and fingering;

limited to performing simple, routine tasks but could regulate appropriately with others for those simple and routine tasks.

(Tr. 105).

The VE affirmed that, with these restrictions, the hypothetical person could not perform any of the plaintiff's past relevant work. (Tr. 105). However, the VE testified to three other representative examples of jobs in the national economy that could be performed: (1) assembly machine tender (DOT 754.685-014, light exertion, SVP 2, with 150,000 open positions nationally); (2) labeler (DOT 920.687-126, light exertion, SVP 2, with 190,000 open positions nationally), and (3) order checker (DOT 222.687-010, light exertion, SVP 2, with 130,000 open positions nationally). (Tr. 106).

The VE stated, upon questioning by the ALJ, that brief interactions with coworkers would not interfere with the function of these jobs. (Tr. 106-108). The VE also opined that, in his opinion, an employer would not tolerate a worker who was off task for fifteen percent or more of an eight-hour workday. (Tr. 108-109). The VE opined that a machine tender could not take unscheduled breaks but an order checker could, so long as productivity remained in an acceptable range over eight hours. (Tr. 109). The VE also opined that, in reference to Depart of Labor ("DOL") productivity surveys, an employer would not tolerate absenteeism of more than one and a half days a month. (Tr. 110). Regarding the consequences of an employee coming in late and leaving early, the VE opined that, in his professional opinion, this was likely more of a disciplinary issue separate from an off-task or absenteeism issue and would be subject to progressive discipline by the employer. (Tr. 111, 117).

Upon examination by the plaintiff's attorney, the VE opined that the restrictions of occasional interaction with coworkers and no collaborative work with teammates would not affect the job numbers she previously set out. (Tr. 112-13). The VE clarified that the mean

11

non-productive time under DOL productivity surveys was between six and eleven percent of an eight-hour workday, which translated to four to six minutes in each hour.  (Tr. 113-114).  In his opinion, however, fifteen percent was the threshold of non-productivity which he believed an employer certainly would not tolerate.  (*Id.*).  Lastly, the VE clarified that, as to absenteeism, the average amount of time considered intolerable by employers under the DOL surveys was one day per month, but, in his opinion, one and a half days was the threshold at which it was surely "too far above average to sustain work."  (Tr. 116-117).

### C.    Relevant Medical Records

A review of the relevant treatment notes in the record shows that, during the relevant period of August 22, 2010, through the DLI of December 31, 2015, the plaintiff was treated mainly by providers at the Marlborough Family Practice for her pain management and other issues.

### 1.    2011-2012 Treatment Notes from Marlborough Family Practice

There is one treatment note from 2011, and it does not show the plaintiff being on any prescribed opioid medication.[4]  (Tr. 598-599).

In early January 2012, the plaintiff presented complaining of back problems and pain for she reported as exacerbated due to cleaning.  (Tr. 592-94).  The note indicated that these problems were managed with exercise and yoga and showed she was not yet prescribed any opioid pain

---

[4]  Throughout the plaintiff's briefing, the terms narcotic and opioids are used interchangeably to describe the pain medications at issue in this appeal.  (*See generally* Doc. No. 12-1).  As the United States Drug Enforcement Administration states, the term narcotic "originally referred to a variety of substances that dulled the senses and relieved pain" or caused stupor.  DRUG ENFORCEMENT ADMINISTRATION, Narcotic Fact Sheet, https://www.dea.gov/sites/default/files/2020-06/Narcotics-2020.pdf (last visited January 19, 2023).  "Though some people still refer to all drugs as 'narcotics,' today 'narcotic' refers to opium, opium derivatives, and their semi-synthetic substitutes. A more current term for these drugs, with less uncertainty regarding its meaning, is 'opioid.'" *Id.*  "Examples include the illicit drug heroin and pharmaceutical drugs like OxyContin, Vicodin, codeine, morphine, methadone, and fentanyl."  *Id.* Additional narcotic opioid medications include Tramadol, hydrocodone, hydromorphone, and meperidine.  *See* NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, Pain Medications - Narcotics, https://medlineplus.gov/ency/article/007489.htm (last accessed Nov. 30, 2022). For consistency and accuracy, the Court shall refer to the pain medications at issue here as opioids except as otherwise quoted by medical providers.

medication. (*Id.*). In late January 2012, the plaintiff returned complaining of back pain and was prescribed one week's worth of tramadol, an opioid pain medication, to be taken as needed.[5] The note stated that the prescription was to be revisited in February 2012, but that light activity could be tolerated and that physical therapy should be considered if this treatment was not effective. (*Id.*).

The plaintiff next presented on March 21, 2012, complaining of lower radiating back and buttocks pain, diagnosed as sciatica. (Tr. 588). The provider noted that the plaintiff had tried to rest and cut back on strenuous activities and had been taking Tylenol and Advil but needed something to help her sleep at night. (Tr. 588). The plaintiff was prescribed a short five-pill course of Percocet, which is a combination of the opioid oxycodone and acetaminophen, and this course was to be reevaluated in a week.[6] (Tr. 589). The plaintiff saw her orthopedist in the intervening time. (*Id.*).

On April 4, 2012, the plaintiff returned to Marlborough, continuing to complain of back pain despite her "excellent" exercise regimen. (Tr. 586-587). The provider noted that she had bulging disc disease, and she was prescribed another five-day course of Percocet. (Tr. 587). On April 13, 2012, the plaintiff was seen again for the same issues and potentially Lyme disease; the provider noted that she was to continue her current regimen and take Vicodin for mild pain and reserve the Percocet for "severe pain at night." (Tr. 585). On April 27, 2012, the plaintiff was

---

[5] "Tramadol is in a class of medications called opiate (narcotic) analgesics. It works by changing the way the brain and nervous system respond to pain." NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, Tramadol, https://medlineplus.gov/druginfo/meds/a695011.html (last accessed Nov. 30, 2022); NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, Tramadol, https://www.ncbi.nlm.nih.gov/books/NBK537060/ (last accessed Nov. 30, 2022).

[6] "Oxycodone is in a class of medications called opiate (narcotic) analgesics. It works by changing the way the brain and nervous system respond to pain. Oxycodone is also available in combination with acetaminophen" which is known among other names, as Percocet. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, Oxycodone, https://medlineplus.gov/druginfo/meds/a682132.html (last accessed Nov. 30, 2022).

seen for a follow up visit where the provider noted that conservative therapy with rehabilitation exercises "is the treatment of choice"; otherwise, the plaintiff was to continue the same pain regimen as her previous visit.  (Tr. 583).

Treatment notes from May and June of 2012 indicate that the plaintiff continued to report back pain associated with sciatica and was still prescribed her standard doses of Percocet for breakthrough pain. (Tr. 580, 577-78, 575-76).

In July 2012, the plaintiff's complaints of low back pain continued, and the notes indicate that she had been referred to a chiropractor, that she had been feeling very well and benefitting from chiropractic therapy and that she had been doing a lot of work around the house.  (Tr. 568). The provider also noted that they were transitioning the plaintiff's pain medication from Percocet to Vicodin, a hydrocodone-based opioid.[7]  (Tr. 574).  The notes also indicate that she was cautioned "not to use the Vicodin for mild to moderate pain."  (Tr. 570).

In August 2012, the plaintiff's back pain continued, and her Vicodin dosage was increased, (Tr. 565, 567), and then decreased.  (Tr. 563).  Treatment notes also showed her as active around the house.  (*Id.*).

In September 2012, her treating physician switched her medicine back to Percocet and increased the dosage again as her pain had gotten "much worse" and her sciatica symptoms had deteriorated.  (Tr. 558, 560).  She was counselled and educated regarding her condition.  (*Id.*).

In October 2012, treatment notes show that her orthopedist cautioned her against overexertion because she "ha[d] injured her back repeatedly over the past few months," and pointed out that "she had been resting her back recently and her pain is improved."  (Tr. 552).  The doctor switched her pain medication back to Vicodin.  (Tr. 554).  The providers also noted (for

---

[7]  *See* NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, Taking Narcotics for Back Pain, https://medlineplus.gov/ency/patientinstructions/000413.htm (last accessed Nov. 30, 2022).

what appears to be the first time) that she "probably suffers from" PTSD but that she declined selective serotonin reuptake inhibitor ("SSRI") medication. (*Id.*). Later in October 2012, her provider noted she was receiving mental health treatment for her PTSD and making progress and that, while the plaintiff felt ready for a dosage reduction in her pain medication, the provider believed that doing so would be "premature since she continues to have pain." (Tr. 549). An October 31, 2012, note indicates that she had been "recently" started on MS Contin,[8] a form of the opioid morphine, to help her sleep—which it did—but that she had reportedly chosen to stop taking it because it made her "so sleepy." (Tr. 546-57). The note also described continued progress for her PTSD through counseling and indicated that the provider believed "some of her pain to be psychogenic related to PTSD." (*Id.*).

The single November 2012 treatment note observed that, "at her last visit we placed her on MS Contin and Vicodin for breakthrough pain," and, in the intervening time, she had "been getting counseling and has had significant improvements." (Tr. 544). The note continued that while she is "still having some fatigue," she "tolerated the medications well," and "she feels she is ready for a dosage reduction in her narcotics." (Tr. 544). The notes showed that her MS Contin was to be reduced and that she would continue with Vicodin for breakthrough pain. (*Id.*).

Other than one report each in October and November, at no point in 2012 did the plaintiff appear to complain of issues of fatigue, brain fog, memory loss or difficulties in her ability to concentrate or focus, or any other side effects, while taking her pain medication.

## 2.    2013 Treatment Notes from Marlborough Family Practice

In June 2013, the plaintiff was doing "very heavy physical labor," including "yardwork," and was "using too much" Vicodin. (Tr. 760-762). In July 2013, providers observed that the

---

[8]    *See* NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, Morphine, https://medlineplus.gov/druginfo/meds/a682133.html (last accessed Nov. 30, 2022).

plaintiff had "been doing very well and holding increased activity without . . . need for higher dose narcotics" and that she was "trying to wean off the meds completely before the end of summer." (Tr. 757).

In early August 2013, treatment notes state that she continued to use Vicodin four times daily and that her stress levels were quite high due to two deaths in the family; she was given a one-time additional prescription of Vicodin to help cope with a stressful road trip. (Tr. 755-756). In an August 30, 2013, follow-up visit, her provider noted that her back pain continued and that he was trying to decrease her Vicodin dosage. (Tr. 749). The provider also noted that her PTSD and anxiety remained symptomatic, but her counseling with her psychotherapist, Dr. Radin, showed progress. (*Id.*). A full examination was performed that that showed, *inter alia*, that her neurologic capacities and psychiatric function, including her mood and affect, all were normal. (Tr. 752).

In September 2013, it appears her Vicodin dosage had increased to six Vicodin daily for "bad days," yet she continued "to be very active and over[did] it physically." (Tr. 746-58). Her provider asked her to "limit the back abusive behavior and heal." (*Id.*).

Similarly, in November 2013, her provider noted she "overdid" it at a party for her daughter, hurting her back; the provider put her on a short course of steroids and refilled her Vicodin. (Tr. 743-45). Further, the provider expressed his concern about her medication usage and its possible risks to her liver health. (Tr. 745).

At no point in 2013 did any treatment note capture any issues with fatigue or brain fog, nor did the plaintiff claim that any other potential side effects of her medication were impacting her.

### 3.    2014 Treatment Notes from Marlborough Family Practice

In January 2014, the plaintiff presented to her provider for back pain after she had spent five days sleeping on a fold out couch in a hospital waiting for her daughter to give birth.  (Tr. 740).  The provider noted that she was using "more Vicodin than usual."  (*Id.*).

In March 2014, her provider once again noted that she had been "trying to cut back on the amount of narcotics she is using daily."  (Tr. 730).  However, her sciatica was "improving," and she had "no current needs for further self-management, education, medication management or counselling at this time."  (Tr. 732).  Her provider suggested she limit her opioid intake and follow up as needed.  (*Id.*).

In a May 9, 2014, follow up visit for an unrelated issue, the provider noted that her psychiatric assessment was oriented to person, place and time, that her "insight and judgment were intact" and that her "affect was normal."  (Tr. 728).  At the time of this visit, the plaintiff was still on Vicodin. (Tr. 727).  On May 13, 2014, she was prescribed oxycodone again to help her arthritis pain, and the provider reviewed with her the side effects of this medication.  (Tr. 724).  The treatment notes also show her as being "slightly more active."  (Tr. 722).

In October 2014, the plaintiff had a pain management follow-up discussion with her provider who noted that "her drug regiment continues to be very complicated" and that she was undergoing "intensive psychotherapy" and "making great strides but when she gets upset she has a fl[are] of her physical pain." (Tr. 718).  Her provider reviewed the side effects of her medications and tried to "simplify her medication list" by (1) reducing her oxycodone dosage from ten milligrams of just oxycodone to 4.835 milligrams of oxycodone with aspirin and (2) directing that she use primarily Vicodin daily to control her pain and oxycodone "only for breakthrough pain." (Tr. 720-721).  The plaintiff was seen at least twice more before 2015 for unrelated medical issues.

At no point in 2014 did any treatment note capture any issues with fatigue or brain fog, nor did she claim that any other potential side effects of her medication were impacting her.

### 4.    2015 Treatment Notes from Marlborough Family Practice

In April 2015, the plaintiff again presented for pain management follow up discussions, and the provider noted that she that "she had been on narcotics for [years]" and "appears well." (Tr. 706-08).  The provider further noted that her "pain management plan was reviewed, her meds renewed" and "medication side effects reviewed."  (*Id.*).  Her oxycodone was increased from one tablet four times daily to six times daily, but later changed back.  (Tr. 708, 704).

In May 2015, the plaintiff had another pain management session during which her provider again noted her longtime "complicated narcotic regimen" and that she was in "pain on a daily basis."  (Tr. 698).  However, he noted that often this pain was "generated from her psychological problems" and that she continued to "make progress with Dr. Radin."  (T. 698).  Her provider "stopped her oxycodone in [lieu of] hydrocodone with ibuprofen exclusively" and noted "because we are stopping the oxycodone, she will require a large amount of hydrocodone for now . . . [s]he understands this is a massive amount of narcotics and we need to reduce this usage soon. Re-evaluate in 1 month."  (Tr. 700).

In her June 2015 follow up visit, her provider noted that she continued to complain of neck and back pain, and she was also now complaining of "headaches and brain fog" and "chronic fatigue as well." (Tr. 694).  The provider noted she had been on "massive amounts of narcotics" and that "we have discussed different options. At this point I want to stop the oxycodone acetaminophen combination as well as the hydrocodone.  She is due for a refill on June 14th. We will switch to oxycodone 10 milligrams with a maximum of 6 tablets daily." (Tr. 694, 696).  The plaintiff had "no questions regarding medications" and her provider indicated he had "made a

referral to the Pain Clinic at Hartford hospital and they will manage her pain going forward." (Tr 696).

### 5.    Other Treatment Notes

A June 2015 note from the plaintiff's rheumatology provider at Starling Physicians observed that "fatigue [has] been [a] main recent issue" for the plaintiff but her neurologic physical exam showed "no signs of sedation" and her speech was "clear and fluent." (Tr. 1064, 1067). A follow up in August 2015 showed her to be "alert and oriented with no focal deficit." (Tr. 1055). In October 2015, the same finding was made. (Tr. 1049). In neither the August nor October visits did the plaintiff complain of fatigue or brain fog.

## III.    THE ALJ'S MARCH 16, 2021, DECISION

On March 16, 2021, ALJ Horton issued the unfavorable decision at issue here. (Tr. 20-31). In the decision, the ALJ followed the familiar five-step sequential review process for determining whether the plaintiff was disabled.[9]  *See* 20 C.F.R. § 404.1520(a).

As an initial matter, the ALJ acknowledged the procedural history of the case and the Appeals Council's three directives to her upon remand. (Tr. 18).

---

[9] An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently employed, then the claim is denied. *Id.* If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at step five that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

At the first step, the ALJ found that the plaintiff last met the insured status requirements under the Social Security Act on December 31, 2015.  (Tr. 20).  Further, the ALJ found that the plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of August 22, 2010, through her date last insured of December 31, 2015.  (Tr. 20).

At the second step, the ALJ found that, through the date last insured, the plaintiff had the following severe impairments: inflammatory arthritis; osteoarthritis; degenerative disc disease; irritable bowel syndrome (IBS); gastroesophageal reflux disease (GERD); depressive disorder; anxiety disorder; and PTSD.  (Tr. 21).[10]

At the third step, the ALJ found that, through the date last insured, the plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."[11]  (Tr. 21-23).   The ALJ explicitly considered the possibility of whether the plaintiff's PTSD qualified under Listing 12.15, as instructed by the Appeals Council.  (*See id.*; Tr. 183).

Prior to the fourth step, the ALJ formulated the plaintiff's physical and mental RFC.  In so doing, the ALJ determined that the plaintiff had the physical residual functional capacity "to perform light work as defined in 20 CFR 404.1567(b) except she was able to perform occasional climbing of ramps and stairs, but she was unable to climb ladders, ropes or scaffolds and could. . . occasionally perform[] balancing, stooping, kneeling, crouching, and crawling." (Tr. 23).  Further,

---

[10] Though the plaintiff alleged fibromyalgia, the ALJ concluded that it was not a medically determinable impairment as "the condition was not confirmed as a diagnosis through laboratory testing or clinical findings during the relevant period" and that the medical evidence was insufficient to establish the condition under Social Security Ruling ("SSR") 12-2.  (Tr. 21).  The ALJ also noted that, "[w]hile the State agency consultants advised that fibromyalgia was a severe impairment, examination findings do not support the diagnosis of fibromyalgia."  (*Id.* (internal record citations omitted)).

[11] The ALJ reviewed the possible listed impairments involving Listing 1.04 (Disorders of the Spine); Listing 1.02 (Dysfunction of a joint(s) (due to any cause)); Listing 14.09 (Inflammatory Arthritis); as well as Listing 12.04 (Depressive, bipolar and related disorders), 12.06 (Anxiety and Obsessive-Compulsive Disorders), and 12.15 (Trauma and Stressor-related disorders).  (Tr. 21-23).  The ALJ's findings at Step Three are not at issue here.

the plaintiff "was able to perform frequent handling and fingering" and should have "no exposure to hazardous machinery or unprotected heights." (*Id.*). As to her mental RFC, the ALJ found that the plaintiff "was able to perform simple, routine tasks and she could relate appropriately to others for those simple, routine tasks but should have . . . no interaction with the general public and no collaborative or teamwork, but she could have . . . brief and superficial interaction with coworkers." (*Id.*).

At step four, the ALJ determined that the plaintiff was unable to perform any past relevant work through the date last insured. (Tr. 29).

At step five, the ALJ determined that, through the date last insured, and considering the plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the plaintiff could have performed. (Tr. 30). Specifically, the ALJ relied on the VE's testimony and found that the plaintiff would have been able to perform the requirements of representative occupations such as Assembly Machine Tender (DOT 754.685-014), Labeler (DOT 920.687-126), and Order Checker (DOT 222.687-010). (Tr. 30-31). All of these jobs would have required performance at the "light" exertional level and are unskilled, with an SVP of 2. (*Id.*). The ALJ estimated that there were at least 130,000 or more such jobs of each type in the national economy. (*Id.*). The ALJ credited the VE's testimony as "consistent with the information contained in the DOT, except the vocational expert testified that she relied on her job knowledge and work experience regarding the interactions with others and collaborative/teamwork, as these are not addressed in the DOT." (Tr. 31).

## IV.   LEGAL STANDARD

The review of a Social Security disability determination involves two levels of inquiry. First, the Court must decide whether the Commissioner applied the correct legal principles in

making the determination. Second, the Court must decide whether the determination is supported

by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). Substantial

evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it

is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).    The reviewing court's

responsibility is to ensure that a claim has been fairly evaluated by the ALJ. *See Grey v. Heckler*,

721 F.2d 41, 46 (2d Cir. 1983).

"The Court does not reach the second stage of review – evaluating whether substantial

evidence supports the ALJ's conclusion – if the Court determines that the ALJ failed to apply the

law correctly." *Palmer v. Saul*, No. 3:19-CV-00920(SALM), 2020 WL 4731350, at *1 (D. Conn.

Aug. 14, 2020).   "Where there is a reasonable basis for doubt whether the ALJ applied correct

legal principles, application of the substantial evidence standard to uphold a finding of no disability

creates an unacceptable risk that a claimant will be deprived of the right to have her disability

determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983,

986 (2d Cir. 1987).

## V.    DISCUSSION

The sole issue raised in this administrative appeal is whether the ALJ erred at step four in

his calculation of the RFC.  (*See* Doc. No. 12-1 at 11-16).  The plaintiff's makes two interrelated

arguments on this point, focusing on the ALJ's alleged failure to consider the side effects of her

opioid pain medication.  First, the plaintiff claims that the ALJ was required, pursuant to SSR 16-

3p, to explicitly address the potential side effects of "brain fog" and "fatigue" and that her failure

to do so renders her credibility analysis of these symptoms faulty.  (*Id.*).  Second, she argues that

the ALJ failed to develop the record as to the medication's side effects and that the ALJ should

have investigated further and "perhaps should have secured a medical expert [] for assistance." (*Id.*).  .

The Commissioner responds that the assessed RFC and the ALJ's credibility assessment of the symptoms of brain fog and fatigue is substantially supported by the evidence in the record. (Doc. No. 14-1 at 4-6).  Moreover, according to the Commissioner, the ALJ considered evidence of the plaintiff's treatment measures, and the plaintiff failed to carry her burden to prove that the side effects of her pain medication warranted a more restrictive RFC.  (*Id.* at 5-7).

### A.    The ALJ Properly Considered the Plaintiff's Symptoms of Brain Fog and Fatigue in Determining her Capacity to Work

The plaintiff contends that "the assigned RFC at step four is [un]supported by substantial evidence, in that the ALJ failed to assess the side effects of medications utilized to treat or alleviate her conditions."  (Doc. No. 12-1 at 4). Specifically, the plaintiff argues that the ALJ erred by not "adequately take into consideration the medications being prescribed and the side effects thereof, as required under SSR 16-3p" when evaluating the plaintiff's alleged symptoms of brain fog and fatigue on her RFC.[12]  (*Id.* at 14; Doc. No. 17 at 1).  The gravamen of the plaintiff's argument is that that her opioid pain medications also caused[13] brain fog and fatigue symptoms, and thus the

---

[12] Social Security Rulings "are binding on all components of the Social Security Administration." *See* 20 C.F.R. § 402.35(b)(1); *accord Heckler v. Edwards,* 465 U.S. 870, 873 n. 3 (1984) (Social Security Rulings are binding on "all components of the Social Security Administration"). "However, they lack the force of law, and are not binding on courts."  *Golden v. Colvin,* No. 5:12-CV-665 GLS/ESH, 2013 WL 5278743, at *6 (N.D.N.Y. Sept. 18, 2013) (citing *Heckler,* 465 U.S. at 873 n. 3).

[13]  The plaintiff claims here in a single conclusory assertion and accompanying footnote that brain fog and fatigue are "inextricably linked to known side effects" of the pain medications the plaintiff was taking.  (Doc. No. 12-1 at 16, *see id.* at 15 n.5).  The plaintiff does not provide any support for this assertion from any evidence in the record.  Moreover, the facts of this case indicate that, at least as to brain fog, that symptom appears linked to manifestations of the plaintiff's PTSD. The one footnote provided by the plaintiff does not include brain fog as a side effect of oxycodone, and the plaintiff's own testimony at the second hearing supports the conclusion that her PTSD caused her brain fog. (*See* Tr. 89-91 ("You wanted to know since 2013 why I haven't gone back to work and how PTSD added to that? . . . My husband was pressuring me. You need to go back, and it was very stressful. And you know and I was having chronic  pain . . . trigger[ing] a flare-up. And once you get a flare-up, and then you can't get out of bend . . .  I couldn't think straight. I couldn't even pay bills and I was having nightmares and you [] freeze . . . So with the brain fog you can't sit and do your bills because your brain is fogged and the fatigue puts you in bed."). Additionally, the plaintiff

ALJ's purported failure to consider this fact or afford more weight to it when determining the limiting effects of these symptoms on her ability to work—*i.e.*, impose a more restrictive RFC—was error warranting remand.   (*See* Doc. No. 12-1 at 11, 15 n.5, 16).

Such an argument attacks the ALJ's credibility assessment of the intensity and persistence of the plaintiff's alleged symptoms on her capacity to work.  *See Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order).   In the DIB context, such claims are reviewed for compliance with 20 C.F.R. § 404.1529.   *See id.*; *Martes v. Comm'r of Soc. Sec.*, 344 F. Supp. 3d 750, 767 (S.D.N.Y. 2018) (analyzing "claims that the ALJ erred in not considering the impact of side effects of medication on his RFC" under 20 C.F.R. § 404.1529's rubric); *Colbert v. Comm'r of Soc. Sec.*, 313 F. Supp. 3d 562, 579 (S.D.N.Y. 2018) (analyzing a credibility argument under the equivalent SSI regulations where the plaintiff "contend[ed] that . . .  the ALJ violated Social Security regulations and rulings in not addressing the side effects of her medication.").
As discussed below, there is substantial evidence to support the ALJ's credibility determination regarding the alleged effects of brain fog and fatigue on the plaintiff's RFC.

### 1.    Applicable Law

As an initial matter, it is well settled that "[i]t is the function of the [Commissioner], not [reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."  *Martes*, 344 F. Supp. 3d at 759 (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)) (internal quotation marks omitted).  "Thus, the ALJ, 'after weighing objective medical evidence, the claimant's demeanor, and other indicia of

---

was treated for Lyme disease throughout the operative period, (*see e.g.*, Tr. 584 (April 2012), 630-633 (May 2014)), a side effect of which is fatigue.  *See* NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, Lyme Disease, https://medlineplus.gov/lymedisease.html (last accessed November 29, 2022) ("At first, Lyme disease usually causes symptoms such as a rash, fever, headache, and fatigue.").  Nonetheless, for the sake of this analysis, the Court credits the fact that, during the operative time, the plaintiff occasionally experienced these symptoms at the same time she was taking opioid medication for back pain.

credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment.'" *Id.* (quoting *Tejada v. Apfel*, 167 F.3d 770, 775-76 (2d Cir. 1999). "If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.* (quoting *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)) (internal quotation marks omitted). "Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable." *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997).

As relevant here, an ALJ must consider alleged symptoms in assessing the plaintiff's RFC. *See* 404.1529(d)(4); SSR 16-3p at *11-12.[14] "As explained in SSR 96–7p[,] where objective medical evidence does not substantiate claimed symptoms, such as side effects, the ALJ must determine the credibility of the claimant's statement based on the factors listed in" 20 C.F.R. § 404.1529. *Colbert*, 313 F. Supp. 3d at 579 (citing *Cichocki*, 534 F. App'x at 75).

In so doing, the ALJ must follow a two-step process evaluation process. SSR 16-3p at *3-4. First, the ALJ must determine whether the claimed impairment could cause the alleged symptoms. *Id.* This first step is not at issue here. Second, the ALJ must evaluate the "intensity and persistence of [the plaintiff's] symptoms such as pain and determine the extent to which [the plaintiff's] symptoms limit his or her ability to perform work-related activities for an adult." *Id.* *Accord* 20 CFR § 404.1529(c)(1). This second portion of the evaluation is often referred to as a

---

[14] Alleged symptoms are also considered at Step Two and Step Three. *See* 20 C.F.R. §§ 404.1529(d)(1)-(3). However, intensity and persistence are not considered as part of the Step Three considerations. *See id.*

"credibility" determination. *See, e.g., Cichocki*, 534 F. App'x at 75; *Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019).[15]

In evaluating the intensity and persistence of claimed symptoms, an ALJ "will consider" objective medical evidence, the plaintiff's own statements, lay and nonmedical evidence, and seven regulatory factors, including "[t]he type, dosage, effectiveness, and side effects of any medication [the plaintiff] take[s] or have taken to alleviate [their] pain or other symptoms." 20 C.F.R. § 404.1529(c)(3)(iv). *Accord* SSR 16-3p at *7-8 ("In addition to using all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3)[.]")

However, the Second Circuit has held that an ALJ need not "explicitly recite the seven relevant factors [in] his credibility determination" if that determination "was supported by substantial evidence in the record." *Cichocki*, 534 F. App'x at 75. That is, where an ALJ has "thoroughly explained his credibility determination and the record evidence permits [the Court] to glean the rationale of the ALJ's decision, the ALJ's failure to discuss those factors not relevant to his credibility determination does not require remand." *Id.* at 76 (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir.1983)). *See Sabater v. Colvin*, No. 12-CV-594, 2016 WL 1047080, at *7 (S.D.N.Y. Mar. 10, 2016) (finding no error when the ALJ did not address "complaints of significant adverse side effects" in writing when discounting the plaintiff's testimony because the ALJ "weighed all the evidence of Plaintiff s symptoms, both subjective and objective" and found the plaintiff's claims "simply not consistent with treatment notes" or with the plaintiff's own

---

[15] SSR 16-3p states that the Social Security Administration is "eliminating the use of the term 'credibility' from [its] sub-regulatory policy, as [their] regulations do not use this term" and "clarify[ies] that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p at *2. Nonetheless, courts still use this term when analyzing such claims. *See, e.g.*, *Cichocki*, 534 F. App'x at 75.

statements); *Franklin v. Colvin*, No. 16-CV-06478 (ALC), 2018 WL 1449524, at *8 (S.D.N.Y. Mar. 23, 2018) ("The ALJ, however, need not explicitly discuss a medication or its side effects in his or her decision, so long as the "decision or record indicate[s] that the ALJ considered the issue."); *Colbert v. Comm'r of Soc. Sec.*, 313 F.Supp.3d 562, 580 (S.D.N.Y. 2018) (finding no error where the "ALJ did not explicitly address the side effects of [the plaintiff's] medications, [as] there is ample evidence in the opinion and the record to 'glean the rationale of the ALJ's decision.'") (citation omitted).

### 2. The ALJ Properly Accounted for the Plaintiff's Brain Fog and Fatigue in Determining her RFC

In this case, the ALJ explicitly acknowledged the plaintiff's testimony "that she had poor concentration with fatigue and brain fog," "memory loss and negative intrusive memories and nightmares," and "significant problems with memory and concentration" in both the physical and mental RFC analysis. (Tr. 24, 27). However, the ALJ did not fully credit the limitations of these symptoms as alleged given the medical record. (*See id.*). Accordingly, the ALJ "[a]ccept[ed] that the [plaintiff] had some limitations and the residual functional capacity has the finding for [light exertional] work that involves simple, routine tasks that does not require teamwork or collaborative work activities with no interaction with the general public and only brief and superficial interaction with coworkers." (Tr. 27).

In reaching this conclusion, the ALJ cited to objective medical evidence such as treatment notes, including those from the Marlborough Family Practice that showed "no cognitive deficits or neurocognitive disorders and [that] the claimant managed her own treatment plans and medications (Exhibit 1F-6F)." (Tr. 27). *See* 20 C.F.R. 404.1520(c)(2); SSR 16-3p at *4-5. The ALJ also cited two treating source statements from Dr. Radin that explained that the plaintiff had been in weekly therapy since 2013 to treat her anxiety and depression. (Tr. 27). The plaintiff does

not contest these factual findings, and the Court's review of the record shows that they are supported by substantial evidence. For example, the Marlborough Family Practice treatment notes cited by the ALJ show that the plaintiff's neurologic assessments remained normal, and her pain management plan and the side effects of her pain medications were reviewed without question by the plaintiff. (*See* Tr. 752, 720-21, 728, 704-08). In fact, barring two instances—October-November 2012 and June 2015—it appears that the plaintiff did not complain of *any* brain fog or fatigue to any provider at the Marlborough Family Practice while on pain medication during the operative period, even when providers also explicitly noted that side effects of narcotics were reviewed. (Tr. 587, 585, 575-78, 724, 706-08). *See generally* Part A, *supra*.

The ALJ also noted that "treatment records show the claimant was very physically active and her bodily pain was typically due to overdoing things (Exhibit 1F, 7F/26-37)." (Tr. 26). This finding is supported by substantial evidence in the record and undercuts the plaintiff's allegations of fatigue. (Tr. 1064, 592-94, 583, 552, 760-62, 722). *See* 20 C.F.R. § 1529(c)(i) (stating that an ALJ "will consider . . . daily activities" in evaluating the intensity and persistence of symptoms).

In addition, the ALJ considered opinion evidence of state agency consultants, finding them persuasive, and the treating source statements of Dr. Radin, which she found partially persuasive.[16] (Tr. 28). Specifically, as to Dr. Radin's opinions, the ALJ opined:

> The undersigned accepts that the claimant has severe mental impairments that impact her ability to function. Specifically, she has physical pain made worse by PTSD that affects her attention, concentration, memory, and ability to socialize. This finding by Dr. Radin supports limiting the claimant to simple and routine work. Moreover, Dr. Radin has expertise in the field of psychiatry and a long-term treating relationship of nearly seven years, which places her in a suitable position in assessing the claimant's mental functioning. However, Dr. Radin's opinion is diminished by the lack of available treatment notes before and after the date last insured to corroborate her assessed findings. . . . Nevertheless, there is value in Dr. Radin's opinion since it accurately establishes that the claimant has severe mental impairments that impact the type of work she would be able to perform, but would

---

[16] The plaintiff takes no issue with the persuasive weight afforded to these opinions.

not preclude the performance of work within the decisional residual functional capacity.

(*Id.*).

Though the ALJ did not explicitly discuss how the side effects of the plaintiff's pain medication could cause or exacerbate symptoms of brain fog or fatigue in the RFC portion of her decision, this was not an error warranting remand because the ALJ's credibility determination was "supported by the evidence in the case record" and was "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight." *Cichocki*, 534 F. App'x at 76 (quoting SSR 96–7p, 1996 WL 74186, at *2) (quotation marks omitted). As just discussed, the "ALJ correctly summarized the claimant's testimony at the hearing" regarding her brain fog and fatigue but "noted numerous statements that contradicted or undermined [the plaintiff's] statements about" these symptoms. *See Colbert*, 313 F. Supp. 3d at 580. Moreover, the ALJ found that brain fog and fatigue would have a moderate effect on the plaintiff's mental capacities and her ability to perform certain jobs, and therefore reflected that limitation in the mental RFC finding. (Tr. 24-27). *See Poole v. Saul*, 462 F. Supp. 3d 137, 159 (D. Conn. 2020) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account . . . but is not required to accept the claimant's subjective complaints without question; [s]he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.") (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)) (citations omitted). Thus, despite the omission of a specific discussion of whether the plaintiff's pain medication produced the side effects of brain fog and fatigue, the ALJ nonetheless "satisfied her obligation to under the regulations to consider the plaintiffs testimony about her symptoms[.]" *Colbert*, 313 F. Supp. 3d at 580. *See Acevedo v. Saul*, 577 F. Supp. 3d 237, 253 (S.D.N.Y. 2021) ("While the ALJ did not

specifically identify Acevedo's reports of dizziness as a side effect of her medication, when 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'") (quoting *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011)).   Indeed, in formulating the plaintiff's RFC, the ALJ explicitly considered the plaintiff's PTSD and the fact that it caused the plaintiff to experience issues with "attention, concentration, memory" which were the symptoms that the plaintiff herself associated with brain fog.   (*See* Tr. 28 (reviewing Dr. Radin's treating source statements discussing PTSD and giving them partial persuasive weight); Tr. 94-96 (second hearing testimony affirming that the plaintiff considered brain fog to involve deficient "concentration and memory" and "difficulty understanding, remembering, and applying information")).

To the extent that the plaintiff argues that ALJ should have imposed more limiting restrictions on her capacity to work based on her alleged brain fog and fatigue, it was her burden to prove so, and she failed to carry this burden.  *See Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the sequential inquiry. . . ."); *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) ("Here, Smith had a duty to prove a more restrictive RFC, and failed to do so.") (citing 42 U.S.C. § 423(d)(5)).

## B.   Development of the Record

In a related attempt to argue that the ALJ erred by failing to consider the claimed brain fog and fatigue side effects of the plaintiff's pain medication, the plaintiff contends that the ALJ was obligated to further develop the record by "perhaps . . . secur[ing] a medical expert, for assistance." (Doc. No. 12-1 at 16; Doc. No. 17 at 3).   This contention is also without merit.

The well-settled rule is "that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,' even if the claimant is represented by counsel." *Tejada v*, 167 F.3d at 774 (quoting *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996)); *accord Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508 (2d Cir. 2009). However, this affirmative obligation only arises where there exists "clear gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 79-80 (2d Cir. 1999). *See Geckle v. Berryhill*, No. 3:17-CV-208 (JCH), 2018 WL 1472518, at *4 (D. Conn. Mar. 26, 2018) ("The Second Circuit has held that the ALJ's duty to develop the record exists only when there are 'clear gaps' in the record."). "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5 (citation omitted).

The plaintiff argues for the first time in her reply brief that: "a gap can exist where, as here, there is significant evidence within the record of 'massive' medication usage, together with complaints of 'brain fog', and where the medical record indicate[s] side effects were reviewed, with further discussion offered by the medical providers." (Doc. No. 17 at 3).

As an initial matter, while the plaintiff cites to *Rosa* for support for this contention, that case is inapposite here. (*See id.*). In *Rosa*, the ALJ only had "sparse notes which reflected nine visits" between the claimant and the treating physician despite the claimant's testimony suggesting they "had monthly treatment over a period of years." *Rosa*, 168 F.3d at 79-80. Because nine visits were "considerably fewer visits than the two likely had," the Court found that this was a clear gap in the record and "the ALJ should have taken steps directing Rosa to ask [the treating physician] to supplement his findings with additional information." No such situation existed here; there are

copious amounts of treatment notes between August 2010 and December 2015 that discuss the plaintiff's pain and pain medication, at least two of which reference complaints of fatigue and brain fog.  (*See generally* Part II.A, *supra*).   Further, a review of the transcript of the second hearing shows the plaintiff's counsel affirming that the administrative record was complete, notwithstanding records he intended to send to the ALJ.  (*See* Tr. 81-82).  Moreover, the ALJ opined that she even considered medical records created after the date last insured, including another letter from Dr. Radin authored in May 2020.  (Tr. 27-28, 2158).[17]   The plaintiff's fails to point to any gaps in the administrative record or lack of medical history available to the ALJ. Thus, remand is not warranted on this ground.

Lastly, the plaintiff fails to articulate how further development of the record as to brain fog or the potential side effects of her pain medication could (a) support a more restrictive physical or mental RFC or (b) otherwise provide essential support to other evidence of disability, such as a treating source's statement.[18]  *See cf. Cummings v. Saul*, No. 3:19CV01440 (RAR), 2020 WL 5640532, at *5 (D. Conn. Sept. 22, 2020) (finding ALJ has a duty to develop the record as to side effects, even where there was evidence in the record indicating a lack of side effects, because "further evidence of side effects from medication would be significant because of how it would affect the weight to be afforded to [the treating source's] opinion by the ALJ").  *See also Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 110 (2d Cir. 2020) ("Here, the treatment notes were in line with the ALJ's RFC determinations. And because Cook failed to adduce any medical evidence inconsistent with the ALJ's determinations, the ALJ was not faced with 'any clear gaps in the

---

[17] This letter again mentions that the plaintiff was taking a smaller dose oxycodone at the time and makes no mention of brain fog.  (Tr. 1258).

[18] In fact, the plaintiff's briefing seems to take issue only with the ALJ's physical RFC determination.  (Doc. No. 12-1 at 14).

administrative record' that gave rise to an affirmative obligation to" seek more information) (citing *Rosa*, 168 F.3d at 79-80).

## VI.    CONCLUSION

For the foregoing reasons, the Court respectfully recommends that the plaintiff's motion to reverse (Doc. No. 12) be **DENIED**, and the Commissioner's motion (Doc. No. 14) to affirm be **GRANTED**.

This is a recommended ruling. *See* FED. R. CIV. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days after filing of such order. *See* D. CONN. L. CIV. R. 72.2(a). Any party receiving notice or an order or recommended ruling from the Clerk by mail shall have five (5) additional days to file any objection. *See* D. CONN. L. CIV. R. 72.2(a). Failure to file a timely objection will preclude appellate review. *See* 28 U.S.C. §636(b)(1); Rules 6(a) & 72 of the Federal Rules of Civil Procedure; D. CONN. L. CIV. R. 72.2; *Impala v. United States Dept. of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Secretary of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).

Dated this 20th day of January 2023 at New Haven, Connecticut.

  /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge